**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

MICHAEL L. DOMINGUEZ,     )
          )
     Plaintiff,     )
          )     Civil Action No. 07-59 Erie
          )
     v.     )
          )
MICHAEL J. ASTRUE,     )
Commissioner of Social Security,     )
          )
     Defendant.     )

**MEMORANDUM OPINION**

McLAUGHLIN, SEAN J., J.

       Plaintiff, Michael L. Dominguez, commenced the instant action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), seeking judicial review of the final decision of the Commissioner of Social Security denying his claims for disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. § 401 *et seq*, and § 1381 *et seq*. Dominguez filed applications for DIB and SSI on April 8, 2004, alleging disability since March 8, 2004 due to bipolar disorder (Administrative Record, hereinafter "AR", 49-51; 61; 228-230). His applications were denied and he requested a hearing before an administrative law judge ("ALJ") (AR 35-40; 232-236). A hearing was held before an administrative law judge ("ALJ") on January 13, 2006 (AR 240-268). Following this hearing, the ALJ found that Dominguez was not entitled to a period of disability, DIB or SSI under the Act (AR 15-26). His request for review by the Appeals Council was denied (AR 6-9), rendering the Commissioner's decision final under 42 U.S.C. § 405(g). The instant action challenges the ALJ's decision. Presently pending before the Court are cross-motions for summary judgment. For the reasons set forth below, we will grant Defendant's motion and deny Plaintiff's motion.

## I. BACKGROUND

       Dominguez was born on August 22, 1967 and was thirty-eight years old at the time of the hearing before the ALJ (AR 245). He has a sixth grade education and most recently worked for eight years as a laborer making wheelbarrow handles until March 8, 2004 (AR 62; 66; 246). He is married and lives with his wife and four children (AR 245).

Prior to his alleged disability date, Dominguez was psychiatrically evaluated by Asha Prabhu, M.D., on May 7, 2003 (AR 128-129).[1]  He reportedly did not like his job because there were "too many demands" (AR 128).  He complained of irritability, mood swings, trouble controlling his temper, poor concentration, insomnia, anhedonia and feelings of helplessness and hopelessness (AR 128).  He informed Dr. Prabhu that he had been an alcoholic for the past 20 years but at the time of the evaluation only drank on weekends (AR 128).  He denied suffering from any paranoia or any suicidal or homicidal ideations (AR 128).  On mental status examination, Dr. Prabhu reported Dominguez was slightly irritable, his mood was tense, his affect was irritable and he showed no assaultive or self-abusive behaviors (AR 129).  His speech was relevant and goal directed, his memory, abstract thinking, insight, judgment and concentration were intact and he had average intelligence (AR 129).  Dr. Prabhu diagnosed him with depression, rule out bipolar disorder and alcohol abuse, and assigned him a Global Assessment of Functioning ("GAF") score of 55 to 60 (AR 129).[2]  He was started on Paxil (AR 129).

Dominguez returned to Dr. Prabhu on July 9, 2003 and reported that his depression had improved but not to the point desired (AR 127).  He indicated that he was stressed out due to unemployment and had no money for medications (AR 127).  Dr. Prabhu diagnosed major depression and increased his Paxil dosage  (AR 127).  When seen by Carolyn Eastman, R.N., on August 20, 2003, Dominguez reported no significant improvement (AR 127).  He complained of feelings of helplessness and hopelessness, moodiness, irritability and poor sleep (AR 127).  He denied any suicidal or homicidal ideations (AR 127).  He admitted to some alcohol usage (AR 127).  His medication dosage was increased (AR 127).  On October 8, 2003 Dominguez reported

---

[1]Dominguez does not challenge the ALJ's assessment of the evidence relating to his alleged physical impairments.  *Plaintiff's Brief* p. 8.  Accordingly, our factual recitation and discussion will focus exclusively on the evidence relative to his alleged mental impairments.

[2]The GAF score considers psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness.  Scores between 51 and 60 indicate "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers and co-workers)."  *See Diagnostic and Statistical Manual of Mental Disorders: DSM-IV-TR* 34 (4th ed. 2000).

to Dr. Prabhu that he was moody and irritable, but denied any suicidal or homicidal ideations (AR 126). He stated that his ex-wife was considering moving and taking the children, and at times he paced around because he worried about his children (AR 126). He was again diagnosed with major depression and continued on Paxil (AR 126). On November 21, 2003, Ms. Eastman noted that Dominguez took his medications as ordered but had no significant decrease in his symtomology (AR 126). He continued to complain of irritability and moodiness, was reportedly sleeping less and admitted to occasional alcohol usage (AR 126). He was continued on Paxil and Trazodone was prescribed for his sleep problems (AR 126). When seen by Ms. Eastman on December 12, 2003, Dominguez reported that the Trazodone only worked the first night and he then had increased insomnia, with nausea and a decreased appetite (AR 126). He was continued on Paxil and Trazodone was discontinued in favor of an over-the-counter sleep aid (AR 126).

On January 14, 2004, Dominguez reported to Hridayesh Pathak, M.D.[3] that he felt better following an increase in his Paxil dosage but currently felt like his mood was a "three" on a scale of zero to ten, with ten being his best mood (AR 125). He claimed he felt more depressed lately but denied any suicidal thinking (AR 125). He reported that he liked to play the guitar in his leisure time, but had not done so recently (AR 125). His nausea had been eliminated since the Trazodone was discontinued (AR 125). Dr. Pahtak increased his Paxil dosage (AR 125).

On February 6, 2004, Dominguez reported to Ms. Eastman that he felt a "little more mellow" but continued to "snap out" easily when "in a bad mood" (AR 125). He denied using alcohol (AR 125). He reportedly received unemployment and had no insurance (AR 125). He was given a voucher for medication and Ms. Eastman recommended he be evaluated for mood stabilizer medication (AR 125).

Dominguez was seen by Dr. Prabhu on March 24, 2004 (AR 125). He reported that he was very irritable and suffered from mood swings (AR 125). He claimed he had "flipped out" on his boss and quit his job (AR 125). He further reported an incident wherein he became upset, threatened and fought with someone on the street (AR 125). Although Paxil helped, Dominguez complained that his mood swings were "getting way out of control" (AR 125). He denied any suicidal/homicidal ideations and had no paranoia (AR 125). Dr. Prabhu diagnosed him with

---

[3]Dominguez was seen by both Dr. Prabhu and Dr. Pathak at the Counseling Center.

bipolar disorder, started him on Zyprexa and continued him on Paxil (AR 125). When seen by Ms. Eastman on April 15, 2004, Dominguez reported no alcohol usage and denied any suicidal or homicidal ideations (AR 124). He continued to complain of irritability and verbal aggression and outbursts, but denied any further physical aggression (AR 124). Ms. Eastman discontinued the Zyprexa and prescribed Depakote (AR 124).

Dominguez was seen by Dr. Prabhu on April 28, 2004 and complained of irritability, mood swings and anxiety (AR 204). He described his sleep as "fair" and denied any suicidal or homicidal ideations or paranoia (AR 204). Dr. Prabhu reported his mood was tense and his affect was irritable (AR 204). He diagnosed Dominguez with bipolar disorder, added Xanax to his medication regimen as needed for anxiety and counseled him against driving and alcohol usage while taking it (AR 204). He increased his Depakote dosage and continued him on Paxil (AR 204). Klonopin was added to his medication regimen on May 13, 2004 (AR 204).

Douglas Schiller, Ph.D., a state agency reviewing psychologist, reviewed the psychiatric medical evidence of record on May 20, 2004 and completed a mental residual functional capacity assessment form (AR 148-150). Dr. Schiller opined that Dominguez was not significantly limited or only moderately limited in all areas of work functioning (AR 148-149). Dr. Schiller noted that the medical evidence established Dominguez suffered from bipolar disorder and alcohol abuse (AR 150). He found that he was mentally capable of carrying out short, simple instructions and there were no restrictions in his abilities in regards to basic understanding and memory (AR 150). Dr. Schiller concluded that Dominguez was able to meet the basic mental demands of competitive work on a sustained basis despite the limitations resulting from his impairments (AR 150).

Dominguez was seen by Ms. Eastman on May 25, 2004 and complained of feeling irritable, angry and "antsy" but not depressed (AR 204). He relayed an incident wherein he tipped the kitchen table over and threw chairs and other furniture in anger (AR 204). He further relayed that following the described incident he went drinking for the sole purpose of "getting drunk" (AR 205). When cautioned on the negative effects of alcohol abuse on his lifestyle and health, particularly his diabetes, Dominguez stated that he "adjusts" his insulin and that he generally did not use alcohol to such excess (AR 205). Dominguez reported that he drank 30 or

more cups of coffee per day, and Ms. Eastman suggested he decrease his caffeine intake since it could be adding to his edginess and irritability (AR 205). He indicated that Klonopin made him feel "druggy" and it was suggested that he try half a tablet (AR 205). On May 26, 2004 Dominguez was encouraged to discontinue his alcohol usage and attend Alcoholics Anonymous meetings secondary to his history of alcohol abuse, and to attend anger management classes (AR 205). On May 27, 2004 his Depakote dosage was increased (AR 205).

Dominguez underwent a physical disability evaluation on June 9, 2004 performed by Khanh N. Vu, D.O. (AR 151-154). Dominguez reported a history of bipolar disorder that was not well controlled (AR 151). He claimed he suffered from extreme mood swings and was short tempered (AR 151). He reported an altercation with his boss which resulted in his dismissal from work, and that he lost a mechanic's job in March 2004 under similar circumstances (AR 151). Dominguez reported the he smoked two packs of cigarettes a day but drank only socially (AR 152). He enjoyed playing the guitar, writing music, and working on vehicles, but claimed that when he engaged in these activities he would lose interest or become frustrated (AR 152). Dr. Vu reported his affect was appropriate and his dress and grooming were fair (AR 153). Dr. Vu formed an impression of a bipolar diagnosis with an apparent history of anger control problems. He indicated that Dominguez's problems seemed to affect his ability to appropriately integrate into the mainstream work force (AR 154). He recommended that his medications be adjusted to help him achieve a better level of overall functioning (AR 154).

On June 16, 2004, Dominguez reported to Ms. Eastman uncontrollable shaking, irritability and increased anger (AR 205). He had however, unilaterally discontinued taking Depakote for two days (AR 205). Ms. Eastman increased his Klonopin dosage for anxiety/nervousness (AR 205).

When seen by Dr. Pathak on June 30, 2004, Dominguez reported that Klonopin had not helped with his nervousness or shakiness and he complained of grogginess and tiredness on the increased dosage (AR 206). He complained of moodiness and snappiness, and had reportedly pushed his computer off the table the previous evening in frustration (AR 206). He indicated that he did not go out much (AR 206). Dr. Pathak increased his Depakote dosage and reduced his Klonopin dosage (AR 206).

Dominguez reported increased alcohol usage on a regular basis when seen by Ms. Eastman on July 29, 2004 (AR 206). He further reported a decreased use in his medications since he was "in and out of the house" due to marital difficulties (AR 206). Ms. Eastman counseled Dominguez on the increased health risks associated with his alcohol abuse, as well as its negative effect on his treatment, but he stated "I just don't care if something happens to me" (AR 206). He reported increased depression, which Ms. Eastman indicated could be secondary to alcohol abuse and the decrease in medication usage, and he further reported increased anger and irritability (AR 206). She offered him the options of individual therapy, alcohol counseling, marriage counseling and anger management counseling, but she reported he displayed a lack of interest (AR 207). She increased his Paxil dosage to help his depression and counseled him that he needed to take his medication regularly (AR 207). Ms. Eastman reminded him again that his medications would not be effective if he continued to abuse alcohol (AR 207).

When seen by Ms. Eastman on August 23, 2004, Dominguez reported that he rarely used Klonopin but took Depakote and Paxil regularly, although he missed several doses while on a recent camping trip (AR 207). He further reported decreased alcohol usage, but that he continued to suffer from anger, irritability, mood swings, poor concentration and an inability to sit still or focus (AR 207). He complained about the lack of significant progress in his symptoms since starting medication, but acknowledged that completely discontinuing alcohol usage would help his progress (AR 208). Ms. Eastman again referred him to therapy (AR 208).

Dominguez reported continued irritability and inattentiveness when seen by Dr. Pathak on September 22, 2004 (AR 208). Dr. Pathak noted that he had not responded as expected to medications "in spite of good doses" and he displayed inattentiveness and a lack of focus (AR 208). He further wanted to rule out ADHD and a trial of Adderall was added (AR 208).

Dominguez was seen for psychotherapy on September 30, 2004 and a treatment plan was devised (AR 221). He reported that he wanted to be left alone and had trouble with authority figures (AR 221). He further reported that his symptoms were less intense with his medications (AR 221). When seen for psychotherapy on October 14, 2004, Dominguez reported that he was a little "calmer" but continued to remain irritable with bouts of sleeplessness (AR 221).

On October 20, 2004, Dominguez reported to Dr. Pathak that there was no significant

improvement in his ADHD symptoms and he complained of a "drugged up feeling" during the daytime (AR 208). Dr. Pathak diagnosed him with bipolar disorder depressed and ADHD (AR 208). He increased his Adderall dosage, decreased his Depakote dosage and maintained his Paxil dosage (AR 208). During psychotherapy on October 28, 2004 Dominguez and his therapist discussed principles of anger management, as well as his other emotions that were often expressed as anger (AR 222). His therapist reported that he had good insight and asked good questions (AR 222). When seen by Ms. Eastman on November 4, 2004, he reported taking his medication regularly, he felt more awake during the day, had increased concentration and felt more "mellow" on the Adderall (AR 208). He continued to complain of depression however, claiming he placed himself at a one on a scale of one to ten most of the time (AR 209). He claimed to have fleeting suicidal thoughts but had not formulated a plan (AR 209).

On November 15, 2004, he reported during psychotherapy that his depression was worse (AR 222). During his medication management appointment on November 17, 2004 with Dr. Pathak, he reported that he felt about a five on a scale of zero to ten (AR 209). He indicated that although his initial Adderall increase was helpful, it seemed to have lost its effect (AR 209). He admitted to "slip[ping] up" several weeks previous by drinking three beers (AR 209). He agreed to completely refrain from any alcohol use while on his current medication regimen and agreed to a urine drug screen (AR 209). Dominguez denied any suicidal or homicidal ideations, and Dr. Pathak reported that he was alert, oriented to time, place and person, his mood was sad and depressed, and his affect was irritable (AR 209). He was assessed with rule out ADHD, rule out bipolar disorder, history of alcohol abuse, and depression NOS (AR 209). Dr. Pathak discontinued Paxil, initiated Remeron at bedtime, maintained the Depakote and increased the Adderall (AR 209). The Remeron was subsequently discontinued secondary to an increase in Dominguez's blood sugar levels (AR 209). Dr. Pathak also discontinued the Paxil and started him on Wellbutrin (AR 210).

On December 9, 2004, Dominguez was seen for psychotherapy and reported that his depression was better but he remained irritable (AR 223). He complained his family ignored him and he continued to have mood swings (AR 223).

On December 29, 2004, Dr. Pathak reported that Dominguez was alert and oriented, his

eye contact was poor and his insight and judgment were fair (AR 210).  He denied any

hallucinations or delusions, and Dr. Pathak did not consider him to be a risk of harm to himself

or others (AR 210).  He was diagnosed with bipolar disorder NOS, depressive disorder NOS, and

alcohol abuse in remission (AR 210).  Dr. Pathak continued the Depakote and Wellbutrin, and

added Risperdal at bedtime (AR 210).

On January 5, 2005, Dominguez reported to Ms. Eastman that his wife observed him

yelling and arguing with unseen persons; however, he claimed he lost all track of time and had no

memory of the event (AR 120).  Dr. Prabhu discontinued the Risperdal (AR 210).  He was seen

on January 12, 2005 by Dr. Pathak without an appointment due to a crisis at home (AR 211).  His

wife reported that he had been confused, told her he was "Sam," and at one point slapped her

(AR 211).  On mental status examination, Dr. Pathak reported that Dominguez was alert and

oriented, his affect was flat, he was easily irritable and he was positive for paranoia (AR 211).

He psychomotor activity was moderately increased and he displayed poor insight and judgment

(AR 211).  Dr. Pathak diagnosed him with bipolar disorder mixed, impulse control disorder,

partner relational problems and alcohol abuse (AR 211).  He instructed Dominguez to refrain

from any alcohol use, increased his Depakote dosage since it was below therapeutic level,

continued him on Wellbutrin and started Seroquel at bedtime for paranoia and insomnia (AR

211).

Dominguez reported to his therapist on January 13, 2005 that he hoped his increased

medication dosages improved his mood stability (AR 223).  He recounted the incident wherein

he became confused, as well as the past incident wherein he slapped his wife (AR 223).

On February 4, 2005, Dominguez reported no alcohol usage for the last several months

and that his medications had taken the edge off his irritability (AR 211).  He claimed he still

displayed physical aggression in the form of throwing things and punching walls, but was able to

"walk away" more often (AR 211).  He denied any paranoid feelings, had no recent episodes of

blacking out or loss of memory and his sleep had improved (AR 211).  His medications were

continued by Ms. Eastman (AR 211).

When seen by Dr. Pathak on February 16, 2005 for medication management, Dr. Pathak

reported that the Depakote was at therapeutic levels and Seroquel had helped him "a great deal"

with insomnia (AR 212). Dominguez's wife reported that he was not as agitated and had a reasonable demeanor (AR 212). He continued to complain about poor memory, which Dr. Pathak considered to be a function of inattention rather than true memory loss (AR 212). On mental status examination, no overt confusion was noted, he was alert and oriented, no psychotic symptoms were noted and he denied any suicidal/homicidal ideations (AR 212). Dr. Pathak noted that his overall concentration remained poor, but that Dominquez had made "significant improvement" in his impulse control and anger management (AR 212). He continued his medications without any changes (AR 212).

On May 11, 2005, Dominguez reported to Dr. Prabhu that he was depressed, had mood swings and was irritable, but denied any suicidal/homicidal ideations or paranoia (AR 214). He stated that every "little thing" triggered his irritability and that his children drove him crazy when they talked too much (AR 214). While he reported he was compliant with his medications, Dr. Prabhu noted there was "a question mark about that" (AR 214). He increased his Seroquel dosage to help his sleep and mood swings (AR 214).

On June 16, 2005, Dominguez complained of mood swings, irritability, decreased focus/ concentration and occasional isolation (AR 215). He admitted to occasional alcohol use (AR 215). He was encouraged to avoid alcohol and he understood its negative effects on his treatment and health (AR 215). No changes were made in his medications (AR 215).

When seen by Dr. Prabhu on July 6, 2005, Dominguez reported that he stopped taking Seroquel because it caused drowsiness (AR 216). He reported that he continued to remain depressed and unable to sleep but had no suicidal/homicidal ideations, paranoia, anxiety or OCD symptoms (AR 216). On mental status examination, Dr. Prabhu found his mood depressed and his affect blunted (AR 216). He discontinued the Seroquel since Dominquez was not taking it, added Vistaril on an as-needed basis and continued his other medications (AR 216).

Dominguez reported to Ms. Eastman on August 15, 2005 that he continued to occasionally abuse alcohol and smoked "too much" (AR 216). He complained that overall his medications had not helped and he continued to experience anger, mood swings, irritability, racing thoughts, poor concentration/focus/attention and he acted out impulsively (AR 216). He relayed an incident wherein he threw a hammer through a windshield several weeks prior (AR

216).  He denied suffering from any depression or lethargy, but wanted something to help him feel "happy, relaxed, calmer" (AR 216).  On August 17, 2005, Dr. Prabhu discontinued the Wellbutrin per Dominguez's request, and he was advised to avoid alcohol (AR 216).  On September 21, 2005, Dominguez reported his last alcohol usage was one month previous, and that he was "ready to try something else" (AR 216).  He was interested in medication for anxiety, and Vistaril was restarted (AR 217).  Ms. Eastman reviewed the risk factors of his medications should he resume alcohol consumption (AR 217).

On September 28, 2005, Dominguez reported to Dr. Prabhu that he continued to remain irritable, angry and tired, although he was sleeping okay on his medications (AR 218).  He claimed he had not had a drink for one month, and denied any suicidal/homicidal ideations (AR 218).  Dr. Prabhu's notes reflect under the entry "Assessment," "Rule Out Bipolar Disorder" (AR 218).  He was also prescribed Depakote, which dosage was decreased on October 6, 2005 (AR 219).

Finally, Dominguez returned to Dr. Prabhu on December 21, 2005 who found that his Depakote level was low (AR 225).  Dominguez reported that he wanted to discontinue the Depakote, and had stopped taking the Vistaril (AR 225).  He reported no sleep problems, but he stated that he was still irritable and angry and always fought with his wife and children (AR 225).  Dr. Prabhu reported his mood was tense and his affect was irritable (AR 225).  Dominguez requested another mood stabilizer and Dr. Prabhu started him on Lithium (AR 225).

Dominguez and Joseph Kuhar, a vocational expert, testified at the hearing held by the ALJ (AR 240-268).  Dominguez testified that he began mental health treatment in approximately 2002 (AR 250).  He further testified that although he was compliant with his medications, there was very little improvement in his symptoms (AR 251).  He stated he was bipolar, had trouble with anger, was depressed and had trouble sleeping (AR 252-253).  He testified that he was fired from his last job because he "got into it" with his boss (AR 257).  In a previous job, he was warned weekly about his conduct and threatened his supervisor (AR 258).  When he became angry, he broke things, and had broken two computers, a stereo and a CD player (AR 258).  Dominguez testified he was unable to be around people and fought with his wife (AR 254).  He also had decreased concentration, napped several times a day and had more bad days than good

(AR 259-260). He did not socialize with friends or family, go to movies or restaurants and drank approximately every three months (AR 254; 260). He spent a lot of time surfing the web when he had a computer (AR 254). Dominguez had not looked for employment or contacted the Office of Vocational Rehabilitation (AR 256).

The ALJ asked the vocational expert to assume an individual of the same age, education and work experience as Dominguez, who was able to perform work that did not require exertion above the light level, with simple repetitive routine work processes and settings, and no more than incidental interaction with the public, and who could not engage in team work or high stress activities, defined as work involving high quotas or close attention to quality production standards (AR 263). The vocational expert testified that such an individual could perform the light work positions of office cleaner, vehicle cleaner and mold cleaner in the plastics industry (AR 263-264). The ALJ then asked the vocational expert to identify sedentary jobs with the same restrictions (AR 264). The vocational expert testified that such an individual could perform the sedentary positions of food industry sorter, electronics component assembler and a surveillance system monitor (AR 264).

Following the hearing, the ALJ issued a written decision which found that Dominguez was not entitled to a period of disability, DIB or SSI within the meaning of the Social Security Act (AR 15-26). His request for an appeal with the Appeals Council was denied making the ALJ's decision the final decision of the Commissioner (AR 6-9). He subsequently filed this action.

## II. Standard of Review

The Court must affirm the determination of the Commissioner unless it is not supported by substantial evidence. *See* 42 U.S.C. § 405(g). Substantial evidence does not mean a large or considerable amount of evidence, but only "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Pierce v. Underwood,* 487 U.S. 552, 564-65 (1988) (quoting *Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229 (1938)); *see Richardson v. Parales,* 402 U.S. 389, 401 (1971). It has been defined as less than a preponderance of evidence but more than a mere scintilla. *See Richardson,* 402 U.S. at 401; *Jesurum v. Secretary of the United States Dept. of Health and Human Servs.,* 48 F.3d 114, 117 (3d Cir. 1995).

### III. DISCUSSION

Title II of the Social Security Act provides for the payment of disability insurance benefits to those who have contributed to the program and who have become so disabled that they are unable to engage in any substantial gainful activity. 42 U.S.C. § 423(d)(1)(A). Title XVI of the Act establishes that SSI benefits are payable to those individuals who are similarly disabled and whose income and resources fall below designated levels. 42 U.S.C. § 1382(a). A person who does not have insured status under Title II may nevertheless receive benefits under Title XVI. *Compare* 42 U.S.C. § 423(a)(1) *with* 42 U.S.C. § 1382(a). In order to be entitled to DIB under Title II, a claimant must additionally establish that his disability existed before the expiration of his insured status. 42 U.S.C. § 423(a), (c). The ALJ found that Dominguez met the disability insured status requirements of the Act through December 31, 2008 (AR 17). SSI does not have an insured status requirement.

A person is "disabled" within the meaning of the Social Security Act if he or she is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The Commissioner uses a five-step evaluation process to determine when an individual meets this definition:

> In the first two steps, the claimant must establish (1) that he is not engaged in "substantial gainful activity" and (2) that he suffers from a severe medical impairment. *Bowen v. Yuckert*, 482 U.S. 137, 140-41 (1987). If the claimant shows a severe medical impairment, the [Commissioner] determines (3) whether the impairment is equivalent to an impairment listed by the [Commissioner] as creating a presumption of disability. *Bowen,* 482 U.S. at 141. If it is not, the claimant bears the burden of showing (4) that the impairment prevents him from performing the work that he has performed in the past. *Id.* If the claimant satisfies this burden, the [Commissioner] must grant the claimant benefits unless the [Commissioner] can demonstrate (5) that there are jobs in the national economy that the claimant can perform. *Ferguson v. Schweiker*, 765 F.2d 31, 37 (3rd Cir. 1985).

*Jesurum*, 48 F.3d at 117. The ALJ determined that Dominguez's bipolar disorder was a severe impairment, but determined at step three that he did not meet a listing (AR 17-18). Despite his impairments, the ALJ found that he was able to perform work at the light exertional level, but

was limited to simple, routine, repetitive work process and setting, and was limited to work involving only incidental interaction with the public, and could not perform work involving team work or high stress work, defined as high quotas to close attention to quality production standards (AR 18). At the final step, the ALJ concluded that Dominguez could perform the jobs cited by the vocational expert at the administrative hearing (AR 25-26). The ALJ additionally determined that his statements concerning the intensity, duration and limiting effects of his symptoms were not entirely credible (AR 24). Again, we must affirm this determination unless it is not supported by substantial evidence. *See* 42 U.S.C. § 405(g).

Dominguez first argues that the ALJ improperly emphasized his alcohol usage. While Dominguez paints his alcohol usage as "episodic" at most, the administrative record reveals that Dominguez's treatment records consistently contained references to his alcohol use and/or abuse on many occasions (AR 126-127; 152; 205-207; 209; 211; 215-216). Moreover, from April 2004 through at least September 2005, Dominguez was repeatedly advised to refrain from alcohol usage while undergoing treatment, and was advised of the negative effects of alcohol abuse on his lifestyle and health (AR 204-206; 208-209; 211; 215; 271). We therefore reject Dominguez's argument that the ALJ improperly "emphasized" Dominguez's alcohol usage; to the contrary, the ALJ merely recited the contents of his treatment records in his overall evaluation of the medical evidence, which were replete with such references.

Dominguez further argues that the ALJ improperly considered his non-compliance with his treatment regimen in denying benefits. He contends that a denial of benefits due to a failure to follow prescribed treatment arises only where there is first a finding of disability, *see Social Security Ruling* 82-59 ("*SSR*" 82-59), 1982 WL 31384, and since there was no finding of disability made in this case, the ALJ erred.[4] We disagree.

---

[4]*SSR* 82-59 provides that an ALJ may find that an individual has failed to follow prescribed treatment only when:

1. The evidence establishes the individual's impairment precludes engaging in any substantial gainful activity, or in the case of a disabled widow, that the impairment meets or

While there was no finding of disability made in this case, the ALJ may nonetheless consider Dominguez's non-compliance in connection with his credibility assessment. In assessing a claimant's credibility, the ALJ must determine whether the claimant's statements about his symptoms are credible in light of the entire record. *See* 20 C.F.R. §§ 404.1529(c); 416.929(c). In discharging this duty, the regulations provide that the ALJ should consider the objective medical evidence as well as other factors such as a claimant's own statements, the claimant's daily activities, the treatment and medication the claimant has received, any statements by treating and examining physicians or psychologists, and any other relevant evidence in the case record. *Id.*; *see also SSR* 96-7p, 1996 WL 374186 at *3.

Here, in evaluating Dominguez's credibility, the ALJ relied in part upon his failure to follow the prescribed course of treatment:

> The undersigned notes that the claimant's testimony is not fully credible in light of the objective medical evidence of record, as has been discussed in some detail. Regarding compliance with his medication/treatment regimen for his bipolar disorder and diabetes, the claimant's testimony is refuted by the medical evidence, which clearly and repeatedly documents noncompliance with medication and treatment regimen. At times, his noncompliance was also complicated by alcohol abuse, despite the fact that the claimant was repeatedly advised as to the negative impact that alcohol abuse had on both his physical health and his response to mental health treatment. Similarly, while he testified that he only drinks alcohol every three months, this testimony is also refuted by the weight of the medical evidence, which clearly shows a pattern of more frequent episodic alcohol abuse. ...

---

equals the Listing of Impairments; and

2. The impairment has lasted or is expected to last for 12 continuous months from onset of disability or is expected to result in death; and

3. Treatment which is clearly expected to restore capacity to engage in any substantial gainful activity has been prescribed by a treating source; and

4. The evidence of record discloses there has been refusal to follow prescribed treatment. *SSR* 82-59; 1982 WL 31384 at *1.

*SSR* 82-59 is not applicable to the instant case, since it only applies if the ALJ determines that an individual's impairments preclude him from engaging in substantial gainful activity. *See Lozada v. Barnhart*, 331 F. Supp. 2d 325, 340 (E.D.Pa. 2004) (where ALJ finds that claimant does not have a disabling impairment, *SSR* 82-59 does not apply).

(AR 24).  Because all of these findings are supported by the record and the ALJ may properly consider Dominguez's non-compliance in assessing his credibility, we find no error in this regard.  *See e.g., Lozada v. Barnhart*, 331 F. Supp. 2d 325, 340 n.23 (E.D.Pa. 2004) (no error by ALJ in considering plaintiff's noncompliance when assessing credibility since ALJ is directed to consider evidence of the type of medication that the claimant takes, other treatment the claimant receives, and any other factors that might precipitate the claimant's symptoms when evaluating a claimant's statements as to the severity of her impairments); *Hunter v. Barnhart*, 2006 WL 1409726 at *3 (E.D.Pa. 2006) (ALJ properly considered claimant's failure to follow prescribed treatment in evaluating her credibility); *Social Security Ruling* 96-7p, 1996 WL 374186 at *7 (noting an "individual's statements may be less credible if the medical reports or records show that the individual is not following the treatment prescribed").

Finally, Dominguez argues that the ALJ selectively reviewed the medical evidence and minimized or ignored evidence supporting his claim.  In support of this argument, Dominguez reviews each treatment note entry and details each item not discussed by the ALJ.  *See Plaintiff's Brief* pp. 10-25.  For example, he faults the ALJ for failing to note that he was employed when Dr. Prabhu assigned him a GAF score of 55-60.  *Plaintiff's Brief* p. 11.  He also takes issue with the ALJ's failure to mention his medication adjustments in certain treatment entries.  He further criticizes the ALJ for failing to note when he abstained from alcohol abuse and claims he "zero[ed]" in when there was any indication of alcohol usage.  *Plaintiff's Brief*, pp. 13-14; 16.

We find no error in this regard.  As Dominguez acknowledges, consideration of all the evidence does not mean that the ALJ must explicitly refer to each and every finding contained in a report.  *Fargnoli v. Massanari*, 247 F.3d 34, 42 (3rd Cir. 2001) (ALJ not required to discuss every treatment note); *Hur v. Barnhart*, 94 Fed. App. 130, 2133 (3rd Cir. 2004) ("There is no requirement that the ALJ discuss in its opinion every tidbit of evidence included in the record.").  Moreover, we observe that the failure of an ALJ to cite specific evidence does not necessarily establish that such evidence was not considered.  *Phillips v. Barnhart*, 91 Fed. Appx. 775, 777

n.7 (3rd Cir. 2004); *Lozada,* 331 F. Supp. 2d at 336.  Indeed, requiring an ALJ to exhaustively address each and every finding in the record would prove too burdensome.  As long as the ALJ "articulates at some minimum level [his] analysis of a particular line of evidence," a written evaluation of every piece of evidence is not required.  *Phillips*, 91 Fed.Appx. at 777 n.7.

Here, we find that the ALJ thoroughly reviewed and discussed the medical evidence in a detailed and even-handed fashion.  We further conclude that the limitations which the ALJ placed upon Dominguez, such as restricting him to simple, repetitive, low stress work in a routine work process and setting, involving only incidental interaction with the public, working with things not people, not involving team work and not involving quotas or close attention to quality production standards, (AR 18) were supported by substantial evidence.

### IV. CONCLUSION

Based upon the foregoing reasons, the Commissioner's final decision will be affirmed. An appropriate Order follows.

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

MICHAEL L. DOMINGUEZ,     )
                                   )
          Plaintiff,     )
                                   )     Civil Action No. 07-59 Erie
                                   )
              v.             )
                                   )
MICHAEL J. ASTRUE,     )
Commissioner of Social Security,     )
                                   )
          Defendant.     )

## ORDER

AND NOW, this 11th day of February, 2008, and for the reasons set forth in the accompanying Memorandum Opinion,

IT IS HEREBY ORDERED that the Plaintiff's Motion for Summary Judgment [Doc. No. 8] is DENIED, and the Defendant's Motion for Summary Judgment [Doc. No. 12] is GRANTED. JUDGMENT is hereby entered in favor of Defendant, Michael J. Astrue, Commissioner of Social Security, and against Plaintiff, Michael L. Dominguez. The clerk is directed to mark the case closed.

                               s/ Sean J. McLaughlin
                               United States District Judge

cm: All parties of record. _____

17